## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA
Case No. 20-cv-xxxx (—/—)

**Andrew Arashiba,**

    Plaintiff,

v.

**City of Minneapolis,**

    Defendant.

## COMPLAINT – JURY DEMANDED

### Introduction

1. Plaintiff Andrew Arashiba sues the City of Minneapolis for the discriminatory 3 October 2017 discharge and retaliation against then-probationary Minneapolis police officer Andrew Arashiba because of his race, Japanese national origin, and age, in breach of his rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §1981, the Age Discrimination in Employment Act of 1967, the Minnesota Human Rights Act, and the Minneapolis Civil Rights Ordinance.

2. By comparison, the City of Minneapolis coddled and overlooked the professional shortcomings of Minneapolis Police Officers Michael Mays and Mohammed Noor, African-American and Somali-American respectively, while imposing degrading treatment, lower performance ratings, and ultimate

discharge of Arashiba, in spite of his objectively satisfactory performance as a probationary police officer.

3. Minneapolis coddled Officers Mays and Noor until it was no longer objectively or politically possible to coddle them any longer – first with Mays' gratuitous, and fortunately, non-fatal shooting of two non-threatening dogs while on duty in North Minneapolis, and Noor's fatal shooting of Ms. Justine Damond in 2017, which culminated in Noor's felony homicide conviction and the $20,000,000 settlement of the wrongful death lawsuit that Ms. Damond's estate brought against Noor and the City of Minneapolis.

4. Andrew Arashiba was, during his service, the only Japanese-American Minneapolis police officer.

5. As a probationary officer in training, every non-probationary officer, including fleet training officers, is superior to probationary officers in training and thus gives orders to Plaintiff and other probationary training officers in the name of the City of Minneapolis by vicarious liability.

6. By comparison, Minneapolis extended probationary training and retained numerous women, African-American, and Somali probationary police officers.

7. Never once did Minneapolis extend Plaintiff's probationary training, notwithstanding the fact that Plaintiff did not receive a single "NRT," or fatal

"not responsive to training" grade during probation, nor did he commit a single material safety violation or breach of regulation justifying discharge.

8. By comparison, Minneapolis retained numerous African-American, women, and Somali probationary police officers with "NRT's," but discharged Plaintiff who had zero NRT's.

9. By comparison, Minneapolis retained a probationary African-American police officer trainee, Clifton Toles, in Plaintiff's class who failed the POST test twice, yet discharged the Plaintiff – who never failed the POST test. The African-American trainee, shortly after clearing probation, engaged in a bar fight with a civilian that resulted in brain damage to the civilian; Minneapolis retained the officer.

10. By comparison, Minneapolis retained African-American police officer trainee Barlow manifested poor radio communications skills including calling out the wrong callsign and crashed a squad car in training, yet Minneapolis retained him; Plaintiff demonstrated satisfactory radio communications skills as a trainee, never crashed a squad car, and Minneapolis discharged him with one month to go on probation, on 3 October 2017.

11. Arashiba commenced his discrimination complaint with his complaint to the Internal Affairs Department of age and racial discrimination against him by

Mays, which training officer Badowich acknowledged by "LOL" or "Ha-Ha" texts, during Plaintiff's probationary period.

12. Mr. Arashiba also complained to Sergeant McLean of Internal Affairs and Sergeant Aimee Walker, FTO Training Supervisor, about Mays encouraging to use gratuitous, excessive force upon an inebriated Native American elder in violation of clearly established constitutional law, Minnesota statute prohibiting excessive force and Minneapolis Police Department regulations prohibiting excessive, unreasonable force, and Mays criticizing Plaintiff for refusing to inflict excessive force on the elder Native American man – in Mays' words, "missing out on a free slap".

13. Arashiba filed a Title VII (race, color, national origin, and retaliation and ADEA age charge of discrimination against Minneapolis within 300 days of his discharge.

14. Arashiba filed supplemental charges of discrimination against Minneapolis under the Minnesota Human Rights Act and the Minneapolis Civil Rights Ordinance.

15. With no intervening acts of misconduct, breach of regulations, or any conduct in derogation of Minneapolis Police Department regulations following Plaintiff's complaint to Internal Affairs, Minneapolis discharged Plaintiff on 3

- 4 -

October 2017, one month before completion of his first, non-extended probationary period.

16. Mr. Arashiba exhausted his administrative remedies

17. Mr. Arashiba put this case into suit timely.

18. Arashiba demands jury trial.

## Jurisdiction

19. Mr. Arashiba state claims that comprise federal questions under 28 U.S.C. §1331.

20. Mr. Arashiba states supplemental claims under Minnesota and Minneapolis law that arise from the same nucleus of operative facts as the facts that support his federal claims.

21. This court has supplemental jurisdiction over Mr. Arashiba's claims under Minnesota and Minneapolis law, in accordance with 28 U.S.C. §1367.

## Parties

22. Plaintiff Andrew Arashiba (Plaintiff, Arashiba) is an adult male.

23. Plaintiff domiciles in Minneapolis, Hennepin County, Minnesota.

24. Plaintiff stood at 46 years of age at the start of his employment by the City of Minneapolis, the start of the facts giving rise to this lawsuit, and 48 at discharge.

25. On information and belief, only one fellow probationary training officer, Officer Franco, 53, was older than Plaintiff.

26. At all times relevant to this action, Plaintiff stood as the only Japanese-American police officer that the City of Minneapolis employed.

27. Defendant City of Minneapolis (City, Minneapolis) is a political subdivision of the state of Minnesota.

28. Minneapolis employed at all times relevant to this lawsuit more than five hundred (500) individuals.

### Venue

29. The substantial number of events giving rise to this lawsuit took place in the City of Minneapolis, County of Hennepin, State of Minnesota.

30. Defendant has its headquarters in the Fourth Division of the United States District of Minnesota.

31. Plaintiff lays venue in the Fourth Division of the United States District of Minnesota in accordance with 28 U.S.C. §1291 and LR D. Minn. 83.11.

### The Facts

32. Andrew Arashiba worked for the City of Minneapolis as a paid community service officer (CSO) from January 2016 through March 2016.

33. Mr. Arashiba earned promotion to the Police Cadet Academy in March 2016.

34. He then worked as a sworn, probationary police officer from 1 November 2016 through 3 October 2017.

35. Mr. Arashiba stood as the only Japanese American police officer in the City of Minneapolis, at all times relevant to this lawsuit.

36. Plaintiff completed field training officer courses from 1 November 2016 through 27 April 2017.

37.

38. Mr. Arashiba complained to MPD Sergeant Aimee Walker, Officer in Charge of Recruits and Cadets, in March 2017, of acts of age discrimination by his supervising field training officers, Minneapolis Police Officers Michael Mays and Badowich.

39. Mays and Badowich, as Plaintiff's fleet training officers and therefore in Plaintiff's direct supervisory chain of command, made fun of Mr. Arashiba's age in recorded transmissions while on active duty acting under color of law as Minneapolis police officers; "Mays: I'm too old for this job." Badowich answered, "Haha." Mays replied, "But not as old as Arashiba," and Badowich answered, "Haha".

40. Mr. Arashiba also complained to superiors of comments by Sgt. Dan McDonald, who remarked, "You must be a fucking idiot to take this job at your age."

41. To a recruit, everyone outranks him or her, including sergeants like Dan McDonald, who are not part of his direct supervisory chain of command.

42. More importantly every fleet training officer (FTO) with whom Plaintiff, or any probationary training officer comes into contact, has a direct influence on the City's decision to discharge or retain Plaintiff or any other probationary training officer.

43. Restated, everything that every training officer of Plaintiff, and every superior officer who came into contact with him while fulfilling his duties on watch, had the direct power to make or break Plaintiff's career as a Minneapolis police officer; Officer Mays, however, according to a fellow officer now close to Mays, manifested a mission to drive Plaintiff out of the police force.

44. Plaintiff was called "motherfucker" on a daily basis during 3rd and 5th Phase FTO; FTO was Officer Michael Mays.

45. To Plaintiff's knowledge, no other Cadet or Recruit was called names by their FTO, to my knowledge.

46. Plaintiff notes that FTO Mays said on several occasions "you aren't a cop until I say you are a cop" this began during the 3rd phase and continued in the 5th phase.

47. After Plaintiff recovered a stolen car on Broadway, Plaintiff asked Officer Mays about use of force.

48. Mays stopped the squad in the middle of the street and proceeded to yell at Plaintiff, yet never explained use of force.

49. Singling Plaintiff out for his age, Mays separated Plaintiff from all other officers writing reports, and made Plaintiff to stand up in a separate room while writing reports, contrary to Minneapolis Police Department training that encourages trainees to seek others' help in writing reports.

50. Mays threatened Plaintiff that he would "catch" Plaintiff if he waivered from Mays' orders, no matter who Plaintiff's FTO was.

51. To Plaintiff's knowledge no other Cadet or Recruit was made to do this.

52. During introductions as a community service officer and cadet-in-training, Plaintiff and Officer-in-Training Franco (53) were subject to repeated mocking by incumbent officers on account of Plaintiff's and Franco's age.

53. Officer who substituted as FTO's after Mays was relieved of FTO duties over Plaintiff, including Officers Brake, Spies, Williams, and Connor all said virtually the same thing to Plaintiff: "Just relax, I'm not going to yell at you like Mays...".

54. These training officers' actions demonstrated that Mays treated Plaintiff differently to other FTO's treating their recruits.

55. FTO Officer Badowich admitted to Plaintiff that Plaintiff was as good as some Police officers on the department and went further to say Plaintiff was as good as some Police Officers at the Precinct.

56. Badowich assured Plaintiff that, at the end of the FTO process, during the fourth phase of training, "We would celebrate, as is tradition with MPD."

57. FTO Officer Ledman, who supervised a portion of Plaintiff's training, said Plaintiff was able to do the job of a Minneapolis Police Officer.

58. Officer Ledman also stated to me that FTO Officer Travis Williams said he did not see any problems with my progression as a Minneapolis Police Officer.

59. Plaintiff's daily evaluations improving dramatically after Mays was relieved of serving as Plaintiff's FTO.

60. In addition to age-based harassment by FTO Mays, Plaintiff suffered insult at the hands of Officer Heather Sterzinger, on or about 30 December 2016 during a midwatch in the midst of Plaintiff's training.

61. Plaintiff's supervisor, Officer Moen indicated to Plaintiff that he improperly called out as Squad 120, not the correct identification, Squad 110.

62. Plaintiff began to search his body cam footage because I wanted to see/hear my mistake.

63. Moen became enraged and told Plaintiff most FTOs would send me home for doubting him and it equated to Plaintiff calling him a liar.

64. Plaintiff was doing neither; he wanted only to take a moment to process his error.

65. Shortly thereafter, Officers Moen and Heather Sterzinger decided they wanted to eat Lotus take out for OTL ("out to lunch").

66. Plaintiff did not order anything because he was down, and unsure of any appetite.

67. While back at the station Moen and Sterzinger ate in the roll call room and Plaintiff sat across the hall in the kitchen.

68. Plaintiff overheard Sterzinger ask what my issue was, and Moen explained what happened.

69. Sterzinger said, "What, is he going to commit hara kiri?"

70. Sterzinger said this two times.

71. Hari kiri is a Japanese term from self-disembowelment, a form of suicide.

72. Plaintiff did not react, but took it as an obvious insult to his Japanese ancestry, origin, and racial heritage by a superior officer.

73. During the fifth phase of probationary training, Plaintiff suffered degraded work conditions after his complaint against Mays and Badowich, including contradictory training instructions from FTO Mays, arbitrary, hostile criticism on routine calls, and being told by Mays that he should have slapped an inebriated, emotionally upset Native American male at 30th St. N. and Irving – "You missed a free slap," which is contrary to Plaintiff's training, Minneapolis Police Department Regulations, Minnesota statutes prohibiting excessive,

unreasonable force by police officers, and clearly established Fourth Amendment constitutional law prohibiting excessive, unreasonable force.

74. During the third phase of probationary training, Mays told Plaintiff not to activate his camera at times that it was required, unless he first told other officers he was "going hot," and instructed him to drive "Code-Two-and-a-Half," which means driving fast with lights, but no sirens, and no camera activation, contrary to MPD protocol.

75. Before a predetermination meeting on 3 May 2017, with no material investigation of the facts at hand, Sgt. Walker advised Plaintiff over the phone that she was recommending termination.

76. Mr. Arashiba complained again of acts of age discrimination at the predetermination meeting.

77. Discharge never came up at the meeting.

78. Minneapolis' Lt. Peterson, Sgt. Walker's superior, then continued Plaintiff on paid administrative leave after Plaintiff's complaint to human resources and Internal Affairs.

79. Plaintiff then had an internal affairs meeting on 12 May 2017, which was transcribed and recorded, in which he again complained of age discrimination.

80. While on administrative leave, Mr. Arashiba committed no employment performance deficiencies.

81. At no time during his training did Plaintiff receive a mark of "NRT," "not responsive to training."

82. If he had, his training course would have ended on the spot.

83. FTO Moen graded Mr. Arashiba satisfactorily for dealing with the public and officers alike, and in knowing Minneapolis streets, ahead of other trainees, in phase 2.

84. Following Mr. Arashiba's complaint of age discrimination on or about 26 March 2017 to Sgt. Walker, Sgt. Walker arranged Arashiba's training under FTO Officer Ledman.

85. Arashiba's average grades under Ledman increased in comparison to his Rope grades (that is, training record grades) under the previous Badowich and Mays.

86. As stated in the Ropes, Ledman found Arashiba capable of doing the job, that he was "not the same cop as when [Arashiba] started, and that Mr. Arashiba's [communication skills with victims were like a 30 year veteran], as set forth in pages 38 and 75 of the Internal Affairs Unit (a/k/a Internal Affairs Department, or IAD).

87. Chronology of Retaliation and False Pretext

88. One month after Mr. Arashiba's complaint of age discrimination to Sgt. Walker, with no intervening adverse performance, Walker informed Mr. Arashiba of his required attendance at a "predetermination hearing" on 3 May

2017. One month after first complaining of age discrimination, with no intervening acts, Walker informed Mr. Arashiba that he was being considered for discharge.

89. Although he was never graded "NRT," Mr. Arashiba was not offered the ten-day evaluation to allow him to be fairly and fully evaluated

90. The City failed to complete its investigation of Mr. Arashiba within the prescribed 3 months.

91. The City discharged Mr. Arashiba on 3 October 2017, 29 days before the end of probation, with no NRT's, no intervening adverse act on Arashiba's part after his 26 March 2017 complaint of age discrimination to Sgt. Walker, and neither finding of adverse action or untruthfulness after the IAU investigation.

92. With no report from Internal Affairs, Minneapolis discharged Mr. Arashiba on 3 October 2017, less than one month before end of probation.

93. Plaintiff suffered embarrassment, humiliation, loss of income from losing his officer-in-training status, and lost future police officer career benefits because of the age-driven, race-driven, and retaliatory, premature discharge before the end of his probationary period.

94. Plaintiff mitigated his damages by getting unemployment insurance and working in an auto body shop, which he owned and continues to own.

95. In spite of his mitigation efforts, Plaintiff suffers ongoing damages on account of Minneapolis' actions against him.

96. The actions of Mays, Badowich, Walker, and Sterzinger manifested callous indifference or reckless, intentional disregard to Plaintiff's clearly established rights to be free from age, race, national origin, and ancestry discrimination, to be free from retaliation for opposing acts of age, racial, national origin, and ancestry discrimination, and, in Mays' and Walker's case, to be free from retaliation for opposing intended infliction of excessive force upon a defenseless civilian, in violation of Minneapolis Police Department Regulations, Minnesota Statutes (particularly Minn. Stat. §609.66), and clearly established Fourth Amendment constitutional law.

97. Plaintiff realleges and reasserts each and every averment and assertion above in each of the following claims.

## CLAIM 1, 2, AND 3: AGE DISCRIMINATION IN VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT, MINNESOTA HUMAN RIGHTS ACT, AND MINNEAPOLIS CIVIL RIGHTS ORDINANCE

98. Defendant City of Minneapolis (a) subjected Plaintiff to a hostile work environment as an officer-in-training, (b) subjected him to differential, degrading terms and conditions of employment, and (c) ultimately discharged him because of his age, in violation of the 1967 Age Discrimination in

Employment Act, the Minnesota Human Rights Act, and the Minneapolis Civil Rights Ordinance.

99. Plaintiff suffered economic damages, including lost back pay, lost front pay, lost fringe benefits, and lost benefits arising from satisfactory completion of probationary training.

100.    Plaintiff, for purposes of the Minnesota Human Rights Act, suffered non-economic damages, including humiliation and embarrassment from being subjected to age-based harassment on the job and ultimate discharge because of his age.

CLAIMS 4, 5, 6, 7, 8, 9, 10, 11, and 12: RACE, COLOR, AND NATIONAL ORIGIN DISCRIMINATION IN VIOLATION OF TITLE VII OF THE 1964 CIVIL RIGHTS ACT, MINNESOTA HUMAN RIGHTS ACT, AND MINNEAPOLIS CIVIL RIGHTS ORDINANCE

101.    Plaintiff realleges and reasserts each and every averment and assertion above in each of the following claims.

102.    Defendant City of Minneapolis (a) subjected Plaintiff to a hostile work environment as an officer-in-training, (b) subjected him to differential, degrading terms and conditions of employment, and (c) ultimately discharged him because of his Japanese-American race, national origin, and color in

violation of Title VII of the 1964 Civil Rights Act, the Minnesota Human Rights Act, and the Minneapolis Civil Rights Ordinance.

103.    Plaintiff suffered economic damages, including lost back pay, lost front pay, lost fringe benefits, and lost benefits arising from satisfactory completion of probationary training.

104.    Plaintiff, for purposes of the Minnesota Human Rights Act, suffered non-economic damages, including humiliation and embarrassment from being subjected to race, color, and national origin-based harassment on the job and ultimate discharge because of his Japanese-American race, color, and national origin.

CLAIM 13: 42 U.S.C. §1981: DISCRIMINATION IN THE MAKING, ENFORCING, AND FULFILLMENT OF PLAINTIFF'S EMPLOYMENT CONTRACT WITH THE CITY OF MINNEAPOLIS BECAUSE OF HIS RACE AND ANCESTRY AS A JAPANESE-AMERICAN

105.    Plaintiff realleges and reasserts each and every averment and assertion above in each of the following claims.

106.    Defendant City of Minneapolis (a) subjected Plaintiff to a hostile work environment as an officer-in-training, (b) subjected him to differential, degrading terms and conditions in the making, enforcement, and fulfillment of

his employment contract as a Minneapolis police officer, and (c) ultimately discharged him because of his Japanese-American race and ancestry.

107.     Plaintiff suffered economic damages, including lost back pay, lost front pay, lost fringe benefits, and lost benefits arising from satisfactory completion of probationary training.

108.     Plaintiff suffered non-economic damages, including humiliation and embarrassment from being subjected to race, color, and national origin-based harassment on the job and ultimate discharge because of his Japanese-American race and ancestry.


CLAIM 14, 15, and 16: RETALIATORY DISCHARGE FOR OPPOSING AGE DISCRIMINATION

109.     Plaintiff realleges and reasserts each and every averment and assertion above in each of the following claims.

110.     Defendant City of Minneapolis retaliated, and waged reprisal against Plaintiff by discharging him in retaliation for opposing acts of age discrimination, in violation of the 1967 Age Discrimination in Employment Act, the Minnesota Human Rights Act, and the Minneapolis Civil Rights Ordinance.

111.    Plaintiff suffered economic damages, including lost back pay, lost front pay, lost fringe benefits, and lost benefits arising from satisfactory completion of probationary training.

112.    Plaintiff suffered non-economic damages, including humiliation and embarrassment from being subjected to race, color, and national origin-based harassment on the job and ultimate discharge because of his Japanese-American race and ancestry.

CLAIM    17:    MINN.    STAT.    §§181.931-181.935,    MINNESOTA WHISTLEBLOWER ACT

113.    Plaintiff realleges and reasserts each and every averment and assertion above in each of the following claims.

114.    Defendant City of Minneapolis retaliated, and waged reprisal against Plaintiff by discharging him in retaliation for opposing Officer Mays' acts encouraging the infliction of excessive, unreasonable force upon an inebriated, defenseless, nonresisting Native American elder during Plaintiff's training under Mays in 2017, in violation of the Minnesota Whistleblower Act, with reference to Minn. Stat. §609.66, Minneapolis Police Department regulations, and clearly established Fourth Amendment constitutional law prohibiting infliction of excessive, unreasonable force upon defenseless, nonresisting individuals.

115.    Plaintiff suffered economic damages, including lost back pay, lost front pay, lost fringe benefits, and lost benefits arising from satisfactory completion of probationary training.

116.    Plaintiff suffered non-economic damages, including humiliation and embarrassment from being subjected to race, color, and national origin-based harassment on the job and ultimate discharge because of his Japanese-American race and ancestry.

PRAYER FOR RELIEF: WHEREFORE PLAINTIFF PRAYS FOR THE FOLLOWING RELIEF

117.    Judgment against the Defendant;

118.    Reinstatement as a police officer, with seniority, benefits, and privileges going back to the commencement of his service in January 2016;

119.    Back pay, with all wages and attendant benefits going back to his discharge on 3 October 2017;

120.    In the alternative to ¶¶118-19, front pay in excess of $75,000, or a sum to be determined by the jury;

121.    Double back pay and front pay, in accordance with the 1967 Age Discrimination in Employment Act;

122.    Compensatory damages for all claims in excess of $75,000, or a sum to be determined by the jury;

123.    Non-economic damages for for all claims in excess of $75,000, or a sum to be determined by the jury;

124.    Punitive damages up to the limits allowed under the Minnesota Human Rights Act and Minneapolis Civil Rights Ordinance;

125.    Civil Penalty for all claims arising under the Minnesota Human Rights Act, in a sum to be determined by a jury;

126.    Prejudgment interest;

127.    Preverdict interest;

128.    Costs and disbursements allowed by law;

129.    Expert witness fees allowed under the Minnesota Human Rights Act;

130.    Reasonable attorneys allowed at 42 U.S.C. §1988, the Minnesota Human Rights Act, and the Minneapolis Civil Rights Ordinance; and

131.    All other legal or equitable relief appropriate under the circumstances.

132.    Plaintiff demands trial by jury on all claims triable to the jury, and determination by the jury of all claims that a jury may determine.

IN STATE OF MINNESOTA, HENNEPIN COUNTY, IN ACCORDANCE WITH 28 U.S.C. §1746, I, PLAINTIFF ANDREW ARASHIBA, DECLARE, UNDER PENALTY OF LAW, THAT THE FOREGOING COMPLAINT, EXCEPT SUCH STATEMENTS MADE ON INFORMATION AND BELIEF AFTER REASONABLE INQUIRY, AND ALL LEGAL TERMINOLOGY AND

HEADINGS PROVIDED BY MY ATTORNEY, ARE TRUE TO THE BEST OF

MY PRESENT KNOWLEDGE.

Date: 21 February 2020 _____

Andrew Arashiba

130.    Reasonable attorneys allowed at 42 U.S.C. §1988, the Minnesota Human Rights Act, and the Minneapolis Civil Rights Ordinance; and

131.    All other legal or equitable relief appropriate under the circumstances.

132.    Plaintiff demands trial by jury on all claims triable to the jury, and determination by the jury of all claims that a jury may determine.

IN STATE OF MINNESOTA, HENNEPIN COUNTY, IN ACCORDANCE WITH 28 U.S.C. §1746, I, PLAINTIFF ANDREW ARASHIBA, DECLARE, UNDER PENALTY OF LAW, THAT THE FOREGOING COMPLAINT, EXCEPT SUCH STATEMENTS MADE ON INFORMATION AND BELIEF AFTER REASONABLE INQUIRY, AND ALL LEGAL TERMINOLOGY AND PLEADINGS PROVIDED BY MY ATTORNEY, ARE TRUE TO THE BEST OF MY PRESENT KNOWLEDGE.

Date: 21 February 2020

Andrew Arashiba

- 21 -

Reviewed and signed in accordance with Minn. Stat. §549.211 and Fed. R. Civ. P. 11.

Date: 21 February 2020        Respectfully:

Peter J. Nickitas Law Office

/s/ _____ (electronically signed)
Peter J. Nickitas, MN Att'y #212313

Reviewed and signed in accordance with Minn. Stat. §549.211 and Fed. R. Civ. P. 11.

Date: 21 February 2020          Respectfully:

Peter J. Nickitas Law Office

/s/ *Peter J. Nickitas* (electronically signed)
Peter J. Nickitas, MN Att'y #212313
Attorney for the Plaintiff
431 S. 7th St. #2446
Minneapolis, MN 55415
651.238.3445(D)/1.888.389.7890(F)
peterjnickitaslawllc@gmail.com/
peterjnickitas@mac.com